1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9                Northern District of California

10                   San Francisco Division

11    DEBRA A. MELANCON,                    No. C 11-05225 LB

12              Plaintiff,                  **ORDER GRANTING IN PART
                                            PLAINTIFF'S MOTION FOR
13        v.                                SUMMARY JUDGMENT, GRANTING
                                            IN PART DEFENDANT'S CROSS-
14    MICHAEL J. ASTRUE,                    MOTION FOR SUMMARY
                                            JUDGMENT, AND REMANDING FOR
15              Defendant.                  FUTHER PROCEEDINGS.**
      _____/
16                                          **[Re: ECF Nos. 22, 23, 24]**

17                        **INTRODUCTION**

18        Plaintiff Debra Melancon moves for summary judgment, seeking judicial review of a final

19    decision by defendant Michael Astrue, the Commissioner of the Social Security Administration (the

20    "Commissioner"), denying her Social Security Income ("SSI") disability benefits for her claimed

21    disability of cervical spine degenerative disc disease, mild degenerative joint disease of the left

22    shoulder, and mild right hip degenerative arthritis.  Pl.'s Mot., ECF No. 22;[1] Administrative Record

23    ("AR") 12, 17.  The Administrative Law Judge ("ALJ") found that Melancon could perform her past

24    relevant work as a "domestic laundry worker" and "mail clerk and handler."  AR 16.

25        Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

26

27    _____

28        [1] Citation are to the Electronic Case File ("ECF") with pin cites to the electronically-
      generated page numbers at the top of the document.

C 11-05225 LB
ORDER

1   without oral argument.  All parties have consented to the court's jurisdiction.  ECF Nos. 4, 9.  For

2   the reasons stated below, the court **GRANTS IN PART** Melancon's motion for summary judgment,

3   **GRANTS IN PART** the Commissioner's cross-motion for summary judgement, and **REMANDS**

4   this case to the Social Security Administration for further proceedings.

5                                    **STATEMENT**

6   **I. PROCEDURAL HISTORY**

7        Melancon, now 57 years old, applied for disability benefits on December 3, 2008.  AR 152.  The

8   Commissioner denied her application both initially and upon reconsideration.  AR 56-59.  Melancon

9   requested a hearing before an ALJ on July 15, 2009.  AR 75-76.

10       ALJ Mary Parnow conducted a hearing on October 25, 2010 in Oakland, California.  AR 22-43.

11  Melancon appeared with her attorney at the time, Daniela Marchelletta, and testified at the hearing

12  along with vocational expert Malcolm Brodzinsky (the "VE").  *Id.*  The ALJ issued a decision on

13  January 20, 2011, AR 10-21, finding Melancon not disabled under the Social Security Act because

14  she could perform her past relevant work as a "domestic laundry worker, mail clerk, and mail

15  handler."  AR 16-17.

16       On or about February 7, 2011, Melancon requested that the Appeals Counsel review the ALJ's

17  decision.  AR 143.  On August 26, 2011, the Appeals Counsel sent Melancon a Notice of Appeals

18  Council Action informing her that it declined to grant the request for review.  AR 1-6.  The Appeals

19  Council's action resulted in the ALJ's January 20, 2011 decision becoming the Commissioner's final

20  decision.  *See* AR 1.

21       On October 26, 2011, Melancon commenced this action for judicial review pursuant to 42 U.S.C.

22  § 405(g).  Compl., ECF No. 1.  Melancon and the Commissioner both now move for summary

23  judgment.  Pl.'s Mot., ECF No. 22; Def.'s Cross-Mot., ECF No. 23.

24  **II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS**

25       This section summarizes (A) the medical evidence in the administrative record, (B) Melancon's

26  testimony, (C) the VE's testimony, and (D) the ALJ's findings.

27       **A. Medical Evidence**

28       Melancon was born on March 11, 1956.  AR 152.  She alleged disability beginning September

UNITED STATES DISTRICT COURT
For the Northern District of California

1  18, 2007, due to cervical spine degenerative disc disease, mild degenerative joint disease of the left

2  shoulder, and mild right hip degenerative arthritis.[2]  AR 10-12.

3  **1. Dr. Jennifer Peter (June 7, 2007)**

4  Dr. Peter evaluated Melancon for left shoulder pain and low back pain at the Highland Hospital

5  Orthopedic Clinic on June 7, 2007.  AR 343-44.  Dr. Peter noted that Melancon had been having this

6  pain intermittently since 2004.  AR 343.  The doctor reported that Melancon was told in 2004 she

7  had a rotator cuff injury.  *Id.*  Her arm was also jerked back in an October 2006 purse-snatching

8  incident.  *See id.*  Dr. Peter noted that Melancon had "full rotator cuff range of motion; however, she

9  is somewhat sore."  AR 343-44.  Dr. Peter found that Melancon was "diffusely tender to palpation

10  over her shoulder.  Nothing can be localized.  She is not stiff."  AR 344.  The doctor noted that

11  Melancon experienced lower back pain, paraspinal, and pain with forward flexion, posterior flexion,

12  and side flexion.  *Id.*  Melancon displayed a negative straight leg test and no radiculopathy.[3]  *Id.*  Dr.

13  Peter concluded: "On plain films, she shows mild degenerative change in the back, but otherwise

14  shoulder benign."  *Id.*  The doctor referred Melancon to physical therapy and prescribed her Motrin

15  for pain.  *Id.*

16  **2. Examination of Shoulder X-Rays (June 7, 2007)**

17  Dr. Werden examined x-rays of Melancon's left shoulder on June 7, 2007.  AR 325-26.  They

18  revealed moderate narrowing of the glenohumeral joint space, "degenerative disk disease at L4-5

19  and at L5-S1 without radiographic changes[,]" and "mild to moderate diffuse osteopenia."[4]  AR

20

21

22  [2]  The Administrative Record includes an undated ALJ hearing decision denying a previous application for disability benefits in which Melancon alleged disability as of March 19, 2004.  *See* AR 46-55.  Because neither party addresses these proceedings, the court does not discuss them.

23

24  [3]  "Dysfunction of one or more spinal nerve roots, characterized by pain and sensory and motor disturbances and often caused by compression; an instance of this."  Oxford English Dictionary, Third Edition, June 2008; online version March 2013 at http://www.oed.com/view/Entry/268516 (accessed March 19, 2013).

25

26

27  [4]  "Abnormal reduction in mineralized bone."  Oxford English Dictionary, Third Edition, September 2004; online version March 2013 at http://www.oed.com/view/Entry/133121 (accessed March 19, 2013).

28

326-27.

### 3. *Examination of Shoulder X-Rays (June 20, 2007)*

Two weeks later, Dr. Chung Lee interpreted x-rays of Melancon's cervical spine.  AR 326.  He found "straightening of the upper cervical lordotic curvature" and disc space narrowing with osteophytic ridging and spondylosis at C4-5, C5-6, and C6-7.  *Id.*

### 4. *Dr. Jason Provus (August 9, 2007)*

Melancon visited the Highland Hospital Orthopedic Clinic on August 9, 2007.  AR 343.  Dr. Provus reported that Melancon was told that she would get a referral for physical therapy but was never contacted and when she called physical therapy, they had no record of her.  *Id.*  He also stated that she reported tenderness to palpation over her left shoulder and demonstrated cervical paraspinal as well as lumbar paraspinal tenderness.  *Id.*  The doctor reported that Melancon had no radiculophathy of her upper extremity and her lower extremity was negative in the straight leg raise test.  *Id.*  He resubmitted a requisition for physical therapy of her left shoulder injury and low back pain.  *Id.*

### 5. *Dr. Nathan Teismann (August 25, 2007)*

On August 24 or 25, 2007 Melancon was treated at the Highland Hospital Emergency Department.  AR 322.  The nurse's notes state that Melancon reported "L hip/back pain x 1 hr ago, constant, unable to describe, 10/10, no recent injury, hx injection in that hip for bursitis 3mths ago."  *Id.*  Dr. Teismann later noted that Melancon complained of "chronic back pain p/w acute exacebation [*sic*] after bending over to clean floors 2 days ago . . . ."  *Id.*  While she was at the hospital, Melancon was given Vicodin, Morphine, Lorazepam, and Zofran.  AR 323.  Dr. Teismann also gave Melancon prescriptions for Vicodin and ibuprofen.  AR 322.

### 6. *Dr. Peter Slabaugh (November 6, 2007)*

Dr. Slabaugh saw Melancon on November 6, 2007 at the Highland Hospital Orthopedic Clinic.  AR 416.  He stated that she had "significant chronic pain in her left shoulder, her lower back, and her right hip, mostly in the buttock area of her right hip."  *Id.*  She had been prescribed physical therapy in the past but had never gotten an appointment.  *Id.*  The doctor noted some L5-S1 arthritis in old x-rays and "a little bit of narrowing in the AC joint and spurring."  *Id.*  He referred her to

UNITED STATES DISTRICT COURT
For the Northern District of California

1   physical therapy again and refilled her Naprosyn prescription.  *Id.*

2           ***7.  Dr. Patrick Siparsky (March 14, 2008)***

3           On March 14, 2008, Melancon was treated for flu-like symptoms.  *See* AR 320-21.  At that time,

4   she reported that she was not having back pain.  AR 320.

5           ***8.  Dr. Amandeep Singh (June 20, 2008)***

6           On June 20, 2008 Melancon was seen by Dr. Amandeep Singh at Highland Hospital.  AR 318-

7   19.  Jane Maclean, R.N. noted that Melanon complained of pain in her left shoulder with reduced

8   range of movement since 2004.  AR 319.  Dr. Singh reported that Melancon had been seeing a

9   physical therapist for several months, with minimal improvement.  AR 318.  The physical therapist

10  referred Melancon to the hospital, stating perhaps she needed an MRI.  *Id.*  Melancon stated that the

11  "pain sometimes radiates up to her neck and down her arm."  *Id.*

12          Dr. Singh conducted a physical examination of Melancon's neck and left shoulder.  AR 318-19.

13  With regard to Melancon's neck, Dr. Singh noted "marked tenderness over the C5-6 area with

14  radicular pain down the left arm with palpation of spine, decreased [range of movement]."  AR 318.

15  A cervical spine x-ray showed marked degenerative joint disease at C4-6.  AR 319.

16          The shoulder examination showed that Melancon had "marked tenderness over trapezius, [full

17  range of movement] (although slow due to pain), negative drop test."  *Id.*  Dr. Singh noted, "I think

18  her shoulder pain is radiculopathy of cervical origin."  AR 319.  He ordered a magnetic resonance

19  imaging ("MRI") and prescribed Vicodin for pain.  *Id.*

20          ***9.  MRI Reading (July 17, 2008 MRI)***

21          Upon examination of an MRI of Melancon's cervical spine on July 17, 2008, Dr. Azad Ghassemi

22  found: "[m]ultilevel degenerative disc disease is present in the cervical spine, which is most

23  significant at C4-5, C5-6 and C6-7 with disc height loss and osteophytes are identified."  AR 327.

24  His impression was that the degenerative disc disease was not "causing significant spinal cord

25  compression or neural foraminal narrowing."  He also identified "[m]ild cord impingement . . . at

26  C4-5."  *Id.*

27

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

### 10. *Dr. Atul Patel (August 27, 2008)*

Dr. Patel conducted a physical examination of Melancon at Highland Hospital on August 27, 2008.  AR 377-78.  According to Dr. Patel, Melancon's arm was injured in 2004 "when she went to reach for something after work."  AR 377.  Since then she suffered from left shoulder pain and "about a year or 2 later she started having pain that went from the shoulder up the neck."  *Id.*  Dr. Patel noted that "[s]he does not have any other symptamology [*sic*].  She does have neck pain associated with this, but primarily the pain is in the shoulder and she has a severe limitation of motion on the left shoulder as well. . . . Her strength in her hand is good, although as mentioned, she has severe limitation in her shoulder itself."  *Id.*

Dr. Patel's physical examination showed that Melancon was "in no acute distress."  *Id.*  He also noted severe limitation in Melancon's shoulder, and reported that she could not lift her shoulder to the side or the front past about ninety degrees.  AR 378.  He wrote that she "has severe pain to palpation along the posterior border of the shoulder."  *Id.*

Dr. Patel stated "I am worried most worried about this lady that she has a rotator cuff injury.  She does not need surgery for the neck.  She just has some mild arthritis and degenerative changes with no evidence of cord compression or the nerve root compression."  *Id.*  Dr. Patel ordered an MRI of her shoulder, referred her to orthopedic surgery, and also refilled her Vicodin and baclofen prescriptions.  *Id.*

### 11. *MRI Reading (October 9, 2008)*

On October 9, 2008, Dr. Reza Pordell examined an MRI of Melancon's left shoulder that was taken to rule out a tear of the rotator cuff muscle.  AR 327-28.  He stated: "There is no evidence for rotator cuff tear."  AR 327.  His impression was that there was "[v]ery minimal to mild tendinosis and tendinitis of the supraspinatus tendon noted.  Mild degree of degenerative changes of the acromioclavicular joint also noted."  *Id.*

### 12. *Dr. Andrew Park (October 14, 2008)*

During a visit to the Highland Hospital Orthopedic Clinic on October 14, 2008, Dr. Park examined Melancon's left shoulder.  AR 376-77.  He stated that "[h]er pain is diffuse around her shoulder, both anteriorly and posteriorly, as well as laterally.  She does have pain and difficulty with

1   overhead motion." AR 376.

2       Dr. Park's physical examination showed "external rotation of 60 degrees, abduction to 110

3   degrees and passively to 135 degrees. . . . She did report some left shoulder pain when her head was

4   tilted to right, which I cannot explain. . . . She did have pain with active adduction of her arm." *Id.*

5       Dr. Park also examined a shoulder MRI that was taken a few weeks previously. *Id.* He "did not

6   identify any rotator cuff pathology" but noted "mild degenerative changes of her AC joint." *Id.*

7       Dr. Park's assessment was that:

8       Clinically, Ms. Melancon has an impingement syndrome, however, radiographically, she
        only has a mild amount of edema in her subacromial bursa, which does not seem to be
9       consistent with the amount of pain she has and the amount of tenderness she has. I was also
        concerned about possible neck etiology of her pain. However, she did have an MRI done a
10      few months ago, which is essentially negative except for some minor degenerative changes.

11      She is asking for SSI disability given her clinical symptoms. I have told her that we can
        likely fill this out for her at her next visit. However, I do not have a good explanation as to
12      the true cause of her pain. I offered her a subacromial injection which she accepted. I
        injected 1 mL of Kenalog, and 3 mL of 1% lidocaine and I will also start her on Naprosyn.
13

14  AR 376-77.

15      ***13. Dr. Caitlin Bailey (December 4, 2008)***

16      Melancon visited the Highland Hospital Orthopedic Clinic on December 4, 2008. AR 375-76.

17  Dr. Bailey reported that Melancon had responded to the subacromial injection that Dr. Park

18  administered and that her pain "is minimal today." AR 375. "Today, she also complains of right

19  low back pain and hip pain, which she says has been ongoing for years and particularly worse in the

20  last several weeks to the point where she has been currently ambulating with a cane." *Id.*

21      Dr. Bailey's objective examination notes state:

22      There is good range of motion of the left shoulder today with external rotation of
        approximately 80 degrees, abduction to essentially normal both actively and passively, and
23      internal rotation to the low thoracic area. She has minimal tenderness to palpation today.

24  AR 375. Dr. Bailey explained that Melancon's lower back and hip pain presumably had been

25  "secondary to her cervical arthritis. She states that her generalized body pain is responsive to this

26  medicine and therefore, I will refill it." AR 375-76. Dr. Bailey ordered x-rays of the right hip and

27  pelvis before the next visit. AR 376.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1        ***14.  Dr. Eric Snoey (December 19, 2008)***

2        Melancon visited the Highland Hospital emergency department on December 19, 2008.  AR 372.

3   She was treated by Dr. Snoey, whose account of the physical examination is as follows:

4       52yo chronic back pain, arthritis c/o upper back pain worse with deep inspiration, bending.
        unclear etiology as fluctuating exam.  c/o upper lattisimus dorsi discomfort by pointing,
5       absolutely no sxs on exam as she acknowledges.  then pointed to bilat uppder/midback and
        stated painful with movement, palpation.  when i palpated along entire back there was no
6       tenderness in aforementioned area.  pt then pointed to lower back and stated pain was in
        lower back with palpation.  when i re-examined entire back pt cannot localize any pain,
7       except a fluctuating pinpoint tenderness.  the only objective finding on exam is slightly
        diminished breath sounds on right.  will xray, instructions for pain control, pmd f/u already
8       secured.

9   AR 372-73.  He prescribed Vicodin and ibuprofen.  *Id.*

10       ***15.  Dr. S. Bussey (December 26, 2008)***

11       Dr. Bussey conducted a Physical Residual Functional Capacity ("PRFC") Assessment on

12   December 26, 2008.  AR 345-49.  He found the following exertional limitations.  Melancon could

13   occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk

14   about 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday.  AR 346.  He also

15   noted that her ability to push and/or pull was limited in the upper extremities to "light and occ

16   push/pull LUE 2' L shoulder DJD (no mat. change from ALJ decision)."  *Id.*  The doctor found that

17   the only applicable postural limitations were that Melancon should only occasionally crawl and

18   never climb ladder/rope/scaffolds.  AR 347.  Dr. Bussey also found that Melancon could reach

19   overhead with her left arm occasionally or never, but had no other manipulative limitations.  *Id.*

20       ***16.  Dr. Bradley Frazee (January 7, 2009)***

21       On January 7, 2009, Melancon visited urgent care to get x-rays on her right hip and pelvis and

22   for attention to left hip pain.  AR 370.  Melancon reported her pain as "10/10, sharp."  *Id.*  Dr.

23   Frazee reported decreased flexion and extension of the lumbar spine with tenderness at the bilateral

24   SI joints.  *Id.*  He noted that Melancon was "able to internally and externally rotate as well as squat

25   to standing if she balances with the cane.  Normal gait."  *Id.*  They gave her Vicodin at the hospital

26   and refilled her prescriptions for Vicodin, Naproxen, and baclofen.  AR 371.

27       ***17.  Dr. William Billings (January 8, 2009)***

28       During a January 8, 2009 visit to Highland Hospital, Dr. Billings noted that "[p]atient previously

1  was complaining of her shoulder, but during this particular visit, reports it was not bothersome at

2  this time." AR 366. Dr. Billings's physical examination found that Melancon "walks with a slow,

3  but nonantalgic gait." *Id.* Her lower back had "fairly diffuse tenderness to palpation, but otherwise

4  exam is not significant." *Id.* "Examination of her AP pelvis and her CT did not reveal any evidence

5  of bony lesions, significant arthritis, spondylolisthesis, or other significant pathologies. She may

6  have a very small amount of arthritis in her hips, but it would have to be very early and it does not

7  sound like a classic clinical case of hip arthritis." *Id.* He refilled her prescriptions for Vicodin and

8  baclofen. *Id.*

9  ### *18 Dr. Peter Slabaugh (March 26, 2009)*

10  Dr. Slabaugh conducted a physical examination of Melancon on March 26, 2009. AR 365. On

11  the left shoulder, the doctor noted "marked AC joint tenderness to palpation and pain with passive

12  forward flexion." *Id.* Melancon's back demonstrated "diffuse tenderness to palpation," and the

13  doctor noted "pain with passive range of motion" of Melancon's right hip and "marked blocked

14  internal rotation with hip flexion." *Id.* Dr. Slabaugh diagnosed Melancon with "[left] shoulder

15  rotator cuff tendonitis/bursitis, lumbar degenerative joint disease, and right hip degenerative

16  disease." *Id.* The doctor also refilled Melancon's prescriptions for Vicodin and Naprosyn. *Id.*

17  ### *19. Dr. Daniel Price (April 17, 2009)*

18  Melancon visited the Highland Hospital emergency room, where Dr. Price was the supervising

19  doctor, complaining of a painful right lower back and right hip area. AR 368. She reported her pain

20  as "10/10." *Id.* The emergency department notes show "marke[d] right paravertebral muscle

21  tenderness and marked tenderness over anterior right hip." *Id.* The notes list a diagnosis of "lumbar

22  st[r]ain [and] hip arthritis . . . ." *Id.* Dr. Price refilled Melancon's prescriptions for Vicodin,

23  baclofen, and Naprosyn. *Id.*

24  ### *20. Dr. I. Newton (May 13, 2009)*

25  On May 13, 2009, Dr. Newton filled out a "case analysis" form. AR 387-88. He reviewed the

26  evidence in the file and wrote that "the assessment is affirmed as written on December 26, 2008."

27  AR 388. He affirmed Dr. Bussey's assessment of light residual functional capacity, "LIGHT

28  RFC/Dr. Bussey." AR 387.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

### 21. Dr. William Billings (May 26, 2009)

On May 26, 2009, based on an examination of x-rays of Melancon's cervical spine and left shoulder, Dr. Billings found improvement in the cervical spine and a minimally arthritic left shoulder. AR 422. The doctor reported that Melancon was using a lumbar corset and that it was helping with the pain. AR 421. He recommended that she attend physical therapy and refilled her prescription for Vicodin and issued a new prescription for Voltaren. AR 422.

### 22. Dr. Azah Ghassemi (May 26, 2009)

Dr. Azad Ghassemi also read x-rays of Melancon's left shoulder and cervical spine. AR 423. He reported that the shoulder x-rays showed "[m]ild osteoarthritic changes of the acromioclavicular joint." *Id.* Melancon's cervical spine x-rays showed that "[m]oderate degenerative disc disease is present at C4-5, C5-6, and C6-7 with large osteophytes." AR 424. His impression was that "[f]urther evaluation by an MRI may be useful to assess for spinal canal stenosis and neural foraminal narrowing." *Id.*

### 23. Dr. Patrick Siparsky (July 21, 2009)

Dr. Siparsky saw Melancon for a refill of her Vicodin prescription on July 21, 2009. AR 421. He stated:

> She complains of significant left shoulder pain, right hip pain, neck pain and just generalized pain throughout. She has been essentially hooked on Vicodin for some time now, and I believe that there is some aspect of the patient's care that is being overlooked, possibly some type of systemic inflammatory disorder which we are not apreciating.
> . . .
> The patient on physical exam has pain with absolutely every motion I attempt. She has pain simply standing up. She has pain with standing up to the point where she has to sit down, and then she has to stand up again. It is difficult to decide exactly what is going on with regard to this patient as her physical exam is inconsistent.
> . . .
> I am worried that she is taking too much Vicodin and may sustain liver damage.

*Id.*

### 24. Dr. Sang-Ick Chang (April - October 2010)

Melancon made her first primary care visit to Dr. Chang on April 30, 2010. AR 420. Dr. Chang's subjective notes state:

This is a first primary care visit with me for this 64-year-old[5] female with osteoporosis and right hip arthritis.  She has no new complaints but continues to note right hip pain and difficulty walking with pain in the morning.  She takes two Vicodin in the morning with ibuprofen and she does much better.  She is tolerating the Fossamax without any difficulty. . . . She is applying for disability.

*Id.*  Dr. Chang noted the Melancon's gait was "moderately antalgic with use of a cane to walk.  *Id.* He noted that her previous hip x-ray "was in January 2009, that revealed mild degenerative joint disease only."  *Id.*

Dr. Chang's assessment was that Melancon had "[d]egenerative hip arthritis, right greater than left that was of mild severity one year ago.  Clinically, she looks more advanced."  He refilled her Vicodin and Fosamax prescriptions and asked her to return in three months.  *Id.*

Melancon saw Dr. Chang again on July 30, 2010.  AR 419.  Chang's notes referenced an April 2010 hip x-ray that "revealed no significant change from prior assessment of mild hip arthritis."  *Id.* His impression was that Melancon had "[d]egenerative hip arthritis.  Right greater than left. Clinically in fair amount of discomfort, but radiologically not operative yet."  *Id.*  Dr. Chang refilled Melancon's Vicodin and Fosamax prescriptions.  *Id.*

On October 15, 2010, Dr. Chang filled out a Physician's Medical Source Statement ("MSS") for Melancon.  AR 401-04.  He diagnosed her with "[d]egenerative hip arthritis bilateral, R>L [and] osteoporosis."  AR 401.  His gave Melancon a "fair-poor" prognosis and noted that he "[e]xpect[ed] progressive worsening."  *Id.*  He identified clinical findings and objective signs including a "severely antalgic gait" and checked "no" in the box following the question "[i]s your patient a malingerer?".  *Id.*  He concluded that Melancon's pain was severe enough to interfere with attention and concentration "frequently."[6]  *Id.*

In the MSS, Dr. Chang also opined about Melancon's functional limitations by filling in one-word answers in blanks and checking boxes.  *See* AR 402-04.  He opined that Melancon could walk less than one city block without rest or severe pain.  AR 402.  Dr. Chang did not know whether there

---

[5]  Melancon was 54 not 64.

[6]  The MSS form states that frequently "means 34% to 66% of an 8-hour working day."  AR 402.

1   were limitations on Melancon's ability to sit or stand in an 8-hour workday except that she would

2   need to walk and shift positions at will because of pain and would need to take frequent unscheduled

3   breaks.  AR 402-03.

4       He indicated that Melancon could "occasionally"[7] lift and carry less than 10 pounds of weight

5   "in a competitive work situation" and "rarely"[8] lift and carry 10, 20, or 50 pound weights.  AR 403.

6   Melancon could "frequently" look down, turn her hear right or left, look up, and hold her head in a

7   static position.  *Id.*  In the final set of check box questions, the doctor indicated that Melancon could

8   occasionally twist, rarely "stoop (bend)" or "crouch/ squat," and never climb ladders or stairs.  AR

9   404.  Based on his review of the medical records, Dr. Chang stated that September 18, 2007 was a

10  reasonable date for these restrictions.  AR 404.

11      **B.  Witness Testimony**

12          ***1.  Melancon Testimony***

13      Melancon appeared before the ALJ on October 25, 2010.  AR 24.  Attorney Daniela Marchelletta

14  represented her at the hearing.  *Id.*  The following is a summary of the facts to which Melancon

15  testified at the hearing.

16      Melancon testified that from approximately April until approximately June 2009, she worked for

17  In-Home Supportive Services ("IHSS") providing in-home care for her brother and sister.  AR 27-

18  28.  At the time of hearing, however, she did not do that work anymore, even for herself.  AR 28.

19  Instead, her niece cooked for her.  *Id.*  Melancon testified that as of the October 25, 2010 hearing,

20  she was still getting paid for "the IHSS work" but that since 2009 in "May, June, something like,

21  after that" she had been been paying her niece to provide the in-home care.  AR 39-40.  In return,

22  she gave her niece half of the IHSS check.  AR 40.

23      Melancon stated that she previously worked as a mail clerk, loading and unloading mail from

24  containers and trucks, filing, and putting mail in mailboxes.  AR 28-29.  She explained that she first

25  experienced pain in her lower back in 1999 when she bent down and then could not get back up.  AR

26  _____

27      [7]  "'Occasionally' means 6% to 33% of an 8-hour working day . . . ."  AR 403.

28      [8]  "'Rarely' means 1% to 5% of an 8-hour working day . . . ."  *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

29.  She elaborated that she feels the pain in her lower back and hip and that it extends all the way down through her right leg.  AR 29-30.  Her left leg was beginning to hurt as well.  AR 30.

She also complained of problems turning her neck, but the record is not clear as to the nature of her complaint.  AR 30.  She also testified that driving over potholes in a car painfully jars her neck.  AR 31.

Melancon also testified about problems with her left shoulder.  AR 31.  She reported that she first injured her left shoulder while working as a mail clerk.  *Id.*  Although she returned to work, she was laid off because her employer considered her to be a liability.  *Id.*  After being laid off, Melancon stated that she found another job but only worked there for one day because she could not move her left arm.  *Id.*  She attended physical therapy appointments for her arm but was unable to do the therapeutic exercises because she could not lift the arm.  *Id.*  She also testified that since 2004 she has not been able to raise her left arm all the way without pain.  *Id.*

Melancon testified that she has been taking Vicodin for the last five years, recently in combination with Motrin.  AR 32, 38.  She explained that the Vicodin makes her feel drowsy and she must lie down for thirty to forty minutes after taking a pill.  AR 32.  She stated that she does not sleep straight through the night and has very little energy during the day.  AR 33.

Melancon testified that she uses a single-point cane to assist with walking and standing.  AR 34.  When asked how many blocks she could comfortably walk, she replied, "I walk about one, two, three – about three blocks at most.  You're saying without the cane, you mean?"  AR 35.  She also explained that she can climb only a few stairs at a time before taking a break and can only sit still for five minutes before needing to shift due to the pain.  AR 35-36.  Melancon stated that she sometimes requires assistance to get in the shower because she cannot lift her leg up over the edge of the bathtub.  AR 36.

**C.  Vocational Expert's Testimony**

Vocational expert Malcolm Brodzinsky testified at the hearing.  AR 41-43.  The ALJ first asked the VE to describe Melancon's past work.  AR 41.  The VE stated that his description of Melancon's past work was consistent with the Dictionary of Occupational Titles ("DOT").  *Id.*  The VE began with the "domestic laundry worker" job (DOT #302.685-010) that Melancon performed most

UNITED STATES DISTRICT COURT
For the Northern District of California

recently, which was unskilled with a Specific Vocational Preparation ("SVP")of 2[9] and light, physical demands.[10]  *Id.*  The VE stated that "the only other work that she held in the past relevant time period was as a mail clerk and as a mail handler."  *Id.*  The "mail clerk" job (DOT #209.687-026) was unskilled with an SVP of 2 and light, physical demands.  *Id.*  Finally, the "mail handler" job (DOT #209.768-014) was semiskilled with an SVP of 4 although the VE added that Melancon

---

[9]  "The DOT lists a specific vocational preparation (SVP) time for each described occupation.  Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  Social Security Ruling 00-4p (SSR 00-4p).

[10]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category . . . requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

20 C.F.R. § 404.1567 (2012).

The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing–the primary difference between sedentary and most light jobs.  A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work . . . .  Relatively few unskilled light jobs are performed in a seated position.

'Frequent' means occurring from one-third to two-thirds of the time.  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time.  The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping.  Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.  They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

Social Security Ruling 83-10 (SSR 83-10).

had performed it at the medium level.[11]  AR 41-42.  Melancon's attorney then asked if a hypothetical person mirroring Melancon's profile would be able to perform the past jobs if given 20% of the workday off.  AR 42.  The VE responded: "No."  AR 43.

In closing, the ALJ stated a concern about the evidentiary record, noting that:

> the only assessment of function we have is from the state agency and then from Dr. Chang and Dr. Chang doesn't give us any sense of stand, walk, sit. . . . I mean I think if we accept Dr. Chang with just the lifting and carrying of 10 pounds, we're down to sedentary and that's no past work.

AR 42.

**D.  Administrative Findings**

Applying the sequential evaluative process as discussed below, on January 20, 2011, the ALJ held that Melancon was not disabled under § 1614(a)(3)(A) of the Social Security Act and therefore was not entitled to supplemental security income.  AR 10-17.

At step one, the ALJ found that Melancon had not engaged in substantial gainful activity since September 18, 2007.  AR 12.

At step two, the ALJ found that Melancon suffered from the following severe impairments: cervical spine degenerative disc disease, mild degenerative joint disease of the left shoulder, and mild right hip degenerative arthritis.  *Id.*

At step three, the ALJ found that Melancon did not suffer from an impairment or combination of impairments that either was listed in the regulations or was medically equivalent to one of the listed impairments.  AR 13.

The ALJ then determined Melancon's residual functional capacity ("RFC") in order to assess, at steps four and five, whether she could perform her past relevant work or any other work considering her age, education, and work experience.  *Id.*  The ALJ found that Melancon had "the [RFC] to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)."  *Id.*

In making this RFC finding, the ALJ stated that she considered Melancon's symptoms and how

---

[11]  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 404.1567.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  consistent they were with the objective medical evidence based on the requirements of 20 C.F.R.

2  §§ 404.1529, 416.929, and Social Security Rulings 96-4p and 96-7p. *Id.* She also stated that she

3  considered opinion evidence under 20 C.F.R. §§ 404.1527 and 416.927 and Social Security Rulings

4  96-2p, 96-5p, 96-6p, and 06-3p. *Id.* The ALJ stated that she then determined whether there was an

5  underlying medically-determinable physical or mental impairment that reasonably could be expected

6  to produce Melancon's pain and symptoms, and then evaluating the intensity, persistence, and

7  limiting effects of the symptoms to determine the extent that they limited Melancon's functioning.

8  *Id.* To the extent that Melancon's statements about the intensity or functionally limiting effects of

9  pain or other symptoms were not substantiated by objective medical evidence, the ALJ stated that

10  she made findings on the credibility of the statements "based on a consideration of the entire case

11  record." AR 13-14.

12        *1. Objective Medical Evidence*

13      The ALJ found that the objective medical evidence established a basis for Melancon's

14  allegations of symptoms but found unpersuasive Melancon's claim that her impairments rendered

15  her unable to perform basic work activities. AR 14. The ALJ then summarized the objective

16  medical evidence on record that supported her finding that Melancon does not suffer from a

17  complete disability.

18      She first stated that Dr. Slabaugh examined Melancon and diagnosed her with "mild arthritis and

19  degenerative changes with no evidence of cord compression or the nerve root compression." AR 15.

20  The same doctor made a notation that Melancon "does not need surgery for her cervical spine

21  degenerative disc disease." *Id.* She wrote that after Dr. Slabaugh prescribed physical therapy,

22  Melancon "never made an appointment for physical therapy as of November 6, 2007." *Id.* The ALJ

23  cited Dr. Provus's report on the absence of radiculopathy in Melancon's left arm and a negative

24  straight leg test. *Id.* (citing AR 343). A doctor who read x-rays taken in April 2010 found mild

25  arthritis in Melancon's right hip, which did not require surgery. *Id.* An examination by Dr. Billings

26  in May 2009 showed only minimal arthritis present in her left shoulder. *Id.* (citing AR 422). The

27  ALJ also emphasized Dr. Siparsky's opinion that it was difficult to decide exactly what ailment

28  Melancon was suffering from since she reported pain "with absolutely every motion the physician

attempted. . . .  [Even] by simply standing up."  *Id.*  Based on these findings, the ALJ concluded that "the medical evidence did not reveal any impairment so severe that the claimant would be considered disabled."  *Id.*

She next turned to the opinion evidence from Dr. Chang, Dr. Bussey, and Dr. Newton.  The ALJ discounted Dr. Chang's opinions based on her finding that the other physicians' opinions and x-rays showed that Melancon's right hip has mild degenerative changes while Dr. Chang indicated that the right hip was the worst side.  AR 15.  Such an oversight, the ALJ concluded, casts doubt on Dr. Chang's medical opinion.  *Id.*

The ALJ assigned significant weight to Dr. Bussey's opinion regarding Melancon's ability to engage in light work but did not specify why this opinion was so persuasive.  *Id.*  She discounted Bussey's opinion regarding any manipulative limitation or push or pull limitation because those opinions were not supported by the objective medical evidence.  AR 15-16.

The ALJ accorded significant weight to Dr. Newton's opinion that Melancon was not disabled and could engage in light work activity.  AR 16.  She cited the fact that Newton's opinions were supported by explanation, medical evidence, and "consideration of the entire medical record by a physician who is familiar with Social Security regulations."  *Id.*

### 2. Credibility Determination

The ALJ assessed Melancon's allegation of disability and her subjective complaints of symptoms as follows:

> The objective medical evidence does establish a basis for the claimant's allegations of symptoms; however, the undersigned is not persuaded that her impairments are so severe as to limit the claimant to an extent to which the claimant would be unable to perform basic work activities.   The claimant has testified to fairly normal activities of daily living which translate to an ability to perform basic work activity.  The undersigned has considered that the claimant does have the alleged severe impairments; thus the undersigned has extended to the claimant the benefit of the doubt and assessed that the claimant can engage in light exertion work activity.  However, the claimant's ability to maintain a household and the claimant's report of activities of daily living are consistent with the ability to perform the work-related activities within the residual functional capacity shown above.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
> . . .

1

2     Claimant's allegation are not fully credible.  The claimant worked in 2009 which is
      inconsistent with her allegations of complete disability.  The fact that the claimant worked
3     after her alleged onset date shows that she is able to perform basic work activity. . . . The
      claimant's doctor also indicated the claimant has a problem with Vicodin.  There was very
      little evidence of medical treatment for the alleged impairments.

4

5     AR 14-15 (citations omitted).

6          *3. Conclusion*

7          After summarizing a portion of the evidence on the record, the ALJ found that Melancon's

8     "subjective complaints and alleged limitations are not fully persuasive and the claimant retains the

9     ability despite her impairments to perform the work activities with the limitation set forth above."

10    AR 16.  Her reference to a work activity limitation implied that Melancon could not perform above

11    the range of light work.  *Id.*  In reaching this conclusion, the ALJ relied on (1) Melancon's lack of

12    credibility, (2) "objective medical evidence," and (3) the medical opinions of Dr. Bussey and Dr.

13    Newton.  AR 14-16.  Having determined that Melancon possessed the residual functional capacity to

14    perform the full range of light work, the ALJ then moved to step four.

15         At step four, the ALJ found that Melancon was capable of performing her past relevant work.

16    AR 16.  The ALJ summarized the VE's testimony regarding Melancon's relevant work experience:

17    "the claimant's past relevant jobs, as []he described it, and as those jobs are described in the DOT,

18    are light unskilled and semi-skilled jobs."  *Id.*  The ALJ stated that "the vocational expert testified

19    the claimant would be able to perform the requirements of [light unskilled and semiskilled] jobs,

20    based on either description."  *Id.*  The ALJ commented: "in comparing the claimant's residual

21    functional capacity with the physical and mental demands of the claimant's past relevant jobs, the

22    undersigned finds the claimant is able to perform these jobs as actually and generally performed, per

23    the [VE]'s testimony."  *Id.*

24         The ALJ thus concluded the sequential process by stating that Melancon "has not been under a

25    disability, as defined in the Social Security Act, from September 18, 2007 through the date of this

26    decision."  *Id.*

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1

**ANALYSIS**

2    Melancon asks the court to (1) review the ALJ's decision, (2) reverse the Commissioner's denial

3 of SSI disability benefits, and (3) remand the matter for immediate payment of benefits.  Pl.'s Mot.,

4 ECF No. 22 at 7, 26.

5 **I. REVIEW OF ALJ'S DECISION**

6    Melancon challenges the ALJ's decision on several grounds.  She argues that: (1) the ALJ erred

7 by her analysis of the medical evidence; (2) the ALJ improperly concluded that Melancon could

8 return to her past relevant work; and (3) the ALJ made an incorrect credibility determination.  Pl.'s

9 Mot., ECF No. 22 at 7.  The court finds that the ALJ erred by her analysis of the medical evidence

10 and reasonably concluded that Melancon's testimony lacked credibility.

11    **A. Standard of Review**

12    Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

13 Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set

14 aside the Commissioner's denial of benefits only if the ALJ's  "findings are based on legal error or

15 are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v.*

16 *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more

17 than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

18 might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

19 Cir. 1995).  If the evidence in the administrative record supports both the ALJ's decision and a

20 different outcome, the court must defer to the ALJ's decision and may not substitute its own

21 decision.  *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

22    **B. Applicable Law: Five Steps to Determine Disability**

23    An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

24 or mental impairment which can be expected to result in death or which has lasted or can be

25 expected to last for a continuous period of not less than twelve months," and (2) the "impairment or

26 impairments are of such severity that he is not only unable to do his previous work but cannot,

27 considering his age, education, and work experience, engage in any other kind of substantial gainful

28 work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

UNITED STATES DISTRICT COURT
For the Northern District of California

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.**  Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(I).

> **Step Two.**  Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.**  Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.**  Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *See Tackett*, 180 F.3d at 1098.

**C.  The ALJ Erred in Evaluating the Medical Evidence**

Melancon moves for summary judgment, arguing that the ALJ erred in her evaluation of the medical evidence in Step Four in several ways. She contends that the ALJ improperly rejected Dr. Chang's medical opinion, gave too much weight to Dr. Newton's opinion and a portion of Dr. Bussey's opinion, and improperly rejected a different portion of Dr. Bussey's opinion. *See* Pl.'s Mot., ECF No. 22 at 17-18. She also argues that the ALJ should not have rejected Melancon's subjective complaints. *Id.* at 22. And because Melancon claims she met her burden at Step Four, she argues that the ALJ failed to properly consider what alternate occupations Melacon could

1    perform given her alleged limitations.  *Id.*

2        The Commissioner counters that the ALJ did not commit reversible error in rejecting and

3    crediting the doctors' opinions as she did and that substantial evidence supports the ALJ's credibility

4    finding.  *See* Def.'s Mot., ECF No. 23 at 3-7.

5        **1.  The ALJ Improperly Discounted Dr. Chang's Opinion**

6        The court first examines whether the ALJ improperly discounted the medical opinion of Dr.

7    Chang.  Melancon argues that the ALJ discounted Dr. Chang's medical opinion on an impermissible

8    basis.  Pl.'s Mot., ECF No. 22 at 18-21.  Specifically, Melancon alleges that the ALJ relied on a

9    perceived "oversight" to undercut the doctor's medical opinion, though no such oversight existed,

10   and that the ALJ failed to provide "specific and legitimate reasons" to reject Dr. Chang's opinion.

11   *Id.* at 19-20.  The court agrees that the ALJ did not state clear and convincing reasons supported by

12   substantial evidence in rejecting Dr. Chang's medical opinion.

13       When determining whether a claimant is disabled, the ALJ must consider each medical opinion

14   in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v.

15   Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  "By rule, the Social

16   Security Administration favors the opinion of a treating physician over non-treating physicians."

17   *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).  "The opinion of a

18   treating physician is given deference because 'he is employed to cure and has a greater opportunity

19   to know and observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169

20   F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

21   "However, the opinion of the treating physician is not necessarily conclusive as to either the

22   physical condition or the ultimate issue of disability."  *Id.* (citing *Magallanes v. Bowen*, 881 F.2d

23   747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).  "If

24   a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory

25   diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record,

26   [it will be given] controlling weight.'"  *Orn*, 495 F.3d at 631(quoting 20 C.F.R. § 404.1527(d)(2)).

27       "If a treating physician's opinion is not given 'controlling weight' because it is not

28   'well-supported' or because it is inconsistent with other substantial evidence in the record, the

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

[Social Security] Administration considers specified factors in determining the weight it will be given." *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-02p at 4 (Cum. Ed. 1996).

"Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d). Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJs weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (quotation and citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quotation omitted).[12] Opinions of non-examining

---

[12] Although the type of reasons needed to reject either a treating or an examining physician's opinion is the same, the amount and quality of evidence in support of those reasons may be different.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining

2   physician's opinion. *See Morgan*, 169 F.3d at 602. An ALJ may rely partially on the statements of

3   non-examining doctors to the extent that independent evidence in the record supports those

4   statements. *Id.* Moreover, the "weight afforded a non-examining physician's testimony depends 'on

5   the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F.3d at

6   1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

7       Here, the ALJ "assign[ed] very little weight to Dr. Chang's opinions" because of a purported

8   conflict between Dr. Chang's opinion and the objective medical evidence. AR 15. Melancon argues

9   that this was error because there is no such conflict and the ALJ failed to provide other specific and

10  legitimate reasons for rejecting Dr. Chang's opinion. *Id.*

11      Dr. Chang is one of numerous treating physicians whom Melancon visited. Prior to Dr. Chang

12  filling out the MSS in October 2010, he had seen Melancon twice, in April and July of 2010. *See*

13  AR 401, 419-20. At one of the two visits, Dr. Chang noted that he performed no clinical

14  examination other than speaking with Melancon and observing that her gait was "moderately

15  antalgic with use of a cane to walk." AR 420. In the MSS, Dr. Chang diagnosed Melancon with

16  "Degenerative hip Arthritis bilateral, R>L . . . Osteoporosis." AR 401. He also checked boxes on

17  ───────────────

18  As the Ninth Circuit explained in *Lester*:

19          Of course, the type of evidence and reasons that would justify rejection of an
            examining physician's opinion might not justify rejection of a treating physician's
20          opinion. While our cases apply the same legal standard in determining whether the
            Commissioner properly rejected the opinion of examining and treating
21          doctors-neither may be rejected without 'specific and legitimate' reasons supported
            by substantial evidence in the record, and the uncontradicted opinion of either may
22          only be rejected for 'clear and convincing' reasons-we have also recognized that the
            opinions of treating physicians are entitled to greater deference than those of
23          examining physicians. *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. §
            404.1527(d). Thus, reasons that may be sufficient to justify the rejection of an
24          examining physician's opinion would not necessarily be sufficient to reject a treating
            physician's opinion. Moreover, medical evidence that would warrant rejection of an
25          examining physician's opinion might not be substantial enough to justify rejection of
            a treating physician's opinion.
26

27  *Lester v. Chater*, 81 F.3d 821, 831 n.8 (9th Cir. 1995).

28

1  the MSS form indicating that Melancon could occasionally lift and carry less than 10 pounds and

2  only rarely lift 10 pounds. AR 403. He also opined that Melancon would have to take frequent

3  unscheduled breaks in a workday and that her pain would frequently interfere with her attention and

4  concentration. AR 402-03. If credited, these physical limitations would mean that Melancon was

5  not able to do "light work" as defined in the DOT. *See supra* n.10.

6       Here, Dr. Chang's opinion as to Melancon's physical limitations was contradicted by non-

7  treating, non-examining doctors Bussey and Newton. *Compare* AR 402-03 (Dr. Chang's MSS),

8  *with* AR 346-47 (Dr. Bussey's assessment of exertional limitations), *and* AR 387-88 (Dr. Newton's

9  assessment affirming Dr. Bussey's findings). Accordingly, in order to reject Dr. Chang's opinion,

10  the ALJ was required to provide specific and legitimate reasons supported by substantial evidence.

11  *See Batson* , 359 F.3d at 1195. The ALJ, however, rejected Dr. Chang's opinion but failed to

12  provide the necessary reasons.

13       The ALJ discounted Dr. Chang's opinion because of perceived oversights and conflicts with the

14  objective medical record. The relevant portion of the ALJ's decision states:

15       The undersigned assigns very little weight to Dr. Chang's opinions because other physicians
     and subsequent x-rays reveal that the right hip has mild degenerative changes at most while
16       Dr. Chang indicated that the right hip was the worst side. Such an oversight casts doubt on
     Dr. Chang's observations and medical opinions.
17

18  AR 15. The court agrees with Melancon that this is an insufficient reason for rejecting Dr. Chang's

19  opinion for several reasons. First, there is no record of subsequent x-rays and thus, contrary to the

20  ALJ's statement, later x-rays do not contradict the content of Dr. Chang's MSS. *See* AR 409-30.

21  Furthermore, the ALJ's opinion acknowledges that Melancon's right hip did, indeed, trouble her

22  more than the left. *See* AR 15 ("The x-ray did reveal the claimant's right hip has greater arthritis

23  than the left hip."). Nor is it logically clear how a diagnosis of "mild degenerative changes at most"

24  would conflict with a diagnosis "that the right hip was the worst side." On this record, the court

25  concludes that the ALJ did not give clear and convincing reasons supported by substantial evidence

26  to reject the treating doctor's opinion.

27       In his summary judgment motion, the Commissioner argues that the ALJ permissibly discounted

28  Dr. Chang's opinion because it was inconsistent with the medical evidence. Def.'s Mot., ECF No.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

23 at 4.  The Commissioner points to the other treating physicians, who "noted that [Melancon's] objective findings were mild in comparison to her allegations of severe pain." *Id.* at 4-5 (listing medical findings in the record).  But Dr. Chang's opinion did not address this issue, which appears to go to credibility.  Instead, he assessed Melancon's exertional limitations.  And the Commissioner and the record do not establish how the ALJ can equate a diagnosis of mild degenerative joint disease with the ability to lift a particular amount of weight at a particular frequency.

The Commissioner also argues that the ALJ's ruling is supported by substantial evidence based solely on Dr. Bussey's and Dr. Newton's opinions.  Def.'s Mot., ECF No. 23 at 5.  But this argument does not address the absence of clear and convincing reasons supported by substantial evidence to support the ALJ's decision to credit the opinions of the state agency non-examining medical consultants over a treating physician whose diagnoses also are consistent with the objective medical evidence.

### 2. The ALJ's Treatment of the Non-Examining State Agency Medical Consultants

Melancon argues that the ALJ improperly discounted part of Dr. Bussey's opinion and also improperly credited another part.  *See* Pl.'s Mot., ECF No. 22 at 17-18.  She also argues that the ALJ improperly relied on Dr. Newton's opinion.  *Id.*  Taken together, Dr. Bussey and Dr. Newton opined that Melancon was capable of performing light work but was limited in her use of the left arm.  The court addresses each objection in turn.

### (a) Dr. Bussey's and Dr. Newton's Opinions

Melancon argues that the ALJ erred by relying on Dr. Newton's and Dr. Bussey's opinions that Melancon could engage in the full range of light work.  Pl.'s Mot., ECF No. 22 at 17-18.  She contends that it was improper for the ALJ to rely on the opinions of a "non-treating, non-specialist physician" and a "non-examining, non-treating State Agency evaluator."  *Id.* (referring, respectively, to Dr. Bussey and Dr. Newton).  The ALJ relied on these doctors' opinions for her finding that Melancon could engage in the full range of light work.  AR 16.  As noted previously, an ALJ may rely partially on statements of a non-examining doctors if the evidence in the record supports those statements.  *See Morgan*, 169 F.3d at 602.  But the opinion of a treating physician must be given greater deference than a non-treating, non-examining physician's.  *See Batson* , 359 F.3d at 1195.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Because the ALJ erred by discrediting Dr. Chang's opinion, she also erred by giving significant

2   weight to these opinions.

3                  **(b)  The ALJ Lacked a Basis to Discount Dr. Bussey's Opinion on Limitations**

4         Melancon contends that the ALJ improperly rejected Dr. Bussey's opinions[13] regarding a

5   manipulative limitation and a push or pull limitation because the ALJ's conclusion lacks support in

6   the objective medical evidence.  Pl.'s Mot., ECF No. 22 at 17.  Most of Dr. Bussey's opinion

7   consisted of checking a number of boxes on the PRFC form.  *See* AR 346-48.

8         Dr. Bussey answered a question in the "exertional limitations" section on "push and/or pull"

9   limitations by indicating that Melancon was "limited in upper extremities."  AR 346.  The form also

10  contains the directive: "Explain how and why the evidence supports your conclusions . . . .  Cite the

11  specific facts upon which your conclusions are based."  AR 346.  Dr. Bussey's response was:

12  "Limited to light and occ push/pull LUE 2' L shoulder DJD (no mat. change from ALJ decision)."

13  *Id.*

14        Elsewhere on the form, Dr. Bussey checked a box indicating that Melancon had a limited ability

15  to reach in all directions (including overhead).  *See* AR 347.  The form also directed Dr. Bussey to

16  "[d]escribe how the activities checked 'limited' are impaired.  Also, explain how and why the

17  evidence supports your conclusions . . . . Cite specific facts upon which your conclusion is based."

18  *Id.*  Dr. Bussey's response was: "Occ reach/no OH reach with LUE."  *Id.*  The ALJ interpreted these

19  sentences as a "manipulative or push or pull limitation," which she rejected as "not supported by the

20  objective medical evidence."  AR 16.

21        Melancon argues the ALJ offered only a "rote rationale" that was "vague and conclusory."  Pl.'s

22  Mot., ECF No. 22 at 17.  She also claims that the ALJ is incorrect that Dr. Bussey's opinion is not

23  supported by the objective medical evidence and quotes a Ninth Circuit case that criticized another

24  ALJ for dismissing, without elaboration, a medical opinion as not supported by sufficient objective

25  findings.  *Id.* at 17-18; *see Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).  The quoted

26

27  _____

28       [13]  Although the ALJ does not address the issue, because Dr. Newton affirmed Dr. Bussey's
     opinion, he affirmed Dr. Bussey's manipulative limitation as well.

language, however, pertains solely to an ALJ's rejection of a treating physician, not a non-examining physician. *See Embrey*, 849 F.2d at 421-22. Still, the court agrees that Dr. Bussey's opinion was supported by the medical evidence. As discussed in the facts above, the record contains significant evidence that Melancon suffered from arthritis in her left shoulder. While the record also contains evidence suggesting that Melancon's shoulder arthritis was not debilitating, the ALJ should address that evidence directly. While the ALJ need not accept Dr. Bussey's findings, particularly in light of the contrary medical evidence, the problem here is that she gave Dr. Bussey's opinion littel weight on the erroneous ground that it was not supported.

### D. The ALJ's Credibility Determination

Finally, Melancon challenges the ALJ's finding that Melancon's allegations were not fully credible. *See* Pl.'s Mot., ECF No. 22 at 22-26. A reviewing court must defer to the ALJ's credibility determination if it is supported by substantial evidence in the record. *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). The ALJ's finding here was supported by substantial evidence.

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, the ALJ must engage in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that reasonably could be expected to produce the alleged pain or other symptoms. *See Lingenfelter*, 504 F.3d at 1036. Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear, and convincing reasons for doing so. *Id.*; *see also Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007); *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989). The clear and convincing reasons must specifically identify "'what testimony is not credible and what evidence undermines the claimant's complaints.'" *Parra*, 481 F.3d at 750 (quoting *Lester*, 81 F.3d at 834. In other words, "[g]eneral findings are insufficient . . . ." *Id.* at 834; *see Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and

UNITED STATES DISTRICT COURT
For the Northern District of California

1    'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of

2    treatment.'"  *Orn*, 495 F.3d at 636 (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  The

3    ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive."  *Morgan*, 169 F.3d at

4    599.

5        Here, the ALJ stated that Melancon's "statements concerning the intensity, persistence and

6    limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above

7    residual functional capacity assessment."  AR 14.  Because Melancon has offered sufficient

8    evidence to support the first prong, and there is no evidence of malingering, the question becomes

9    whether the ALJ offered clear and convincing reasons for rejecting Melancon's testimony regarding

10   shoulder, back, and hip pain.

11       The ALJ provided several reasons for doubting Melancon's credibility.  First, she noted that

12   Melancon worked in 2009, "which is inconsistent with her allegations of complete disability."  AR

13   15.  "Although that work activity did not constitute disqualifying substantial gainful activity, it does

14   indicate that the claimant's daily activities have, at least at times, been somewhat greater than the

15   claimant has generally reported."  AR 14.  At the administrative hearing, Melancon testified that

16   within the past year she had worked by providing in-home care to her siblings.  AR 27-28.  She

17   claimed that she could no longer perform these functions but she was still receiving an IHSS check

18   and paying her niece to do the work for her.  *Id.*

19       Melancon contends that the ALJ erred by relying on Melancon's 2009 work as inconsistent with

20   her allegations because "it did not rise to the level of 'substantial gainful activity.'"  Pl.'s Mot., ECF

21   No. 22 at 23.  Regardless of whether Melancon's activities were disqualifying, her ability to do them

22   after the alleged onset of her disability casts doubt on her credibility.  This doubt is amplified by the

23   arrangement between Melancon and her niece.

24       Second, the ALJ noted that there was "little in the way of objective findings" in the medical

25   record to support Melancon's statements.  AR 15.  As the court's summary of the medical records

26   indicates, several doctors noted that they were unable to find an objective basis to support

27   Melancon's reported pain.  *See, supra* Statement (10/14/2008 appt. with Dr. Park, 12/19/2008 appt.

28   with Dr. Snoey, 1/8/2009 appt. with Dr. Billings, 7/21/2009 appt. with Dr. Siparsky).  Melancon

UNITED STATES DISTRICT COURT
For the Northern District of California

1    suggests that the ALJ misconstrued Dr. Siparsky's records as suggesting he doubted Melancon's

2    symptoms.  *See* Pl.'s Mot., ECF No. 22 at 25.  Given that several treating physicians noted the lack

3    of objective evidence for Melancon's symptoms, the ALJ's conclusion is supported by substantial

4    evidence.

5        Third, the ALJ noted that Dr. Siparsky indicated that Melancon "has a problem with Vicodin."

6    AR 15 (citing AR 421).  Melancon does not dispute that this is a legitimate credibility consideration.

7    *See generally* Pl.'s Mot., ECF No. 22.  Finally, the ALJ noted that "[t]he claimant has testified to

8    fairly normal activities of daily living which translate to an ability to perform basic work activity."

9    AR 14.  According to the ALJ, these include the ability to cook, clean, do laundry, and climb a

10   significant number of stairs.  *Id.* (citing AR 208).  At the hearing, Melancon's testimony was that she

11   could no longer cook, clean, and do laundry, but that she was able to do these tasks until May of

12   June of 2009 – well after the alleged onset of her disability.  *See* AR 28, 35-36.

13       When viewed as whole, the ALJ's reasons for discrediting Melancon's subjective complaints are

14   supported by substantial evidence.  In particular, the reported daily activities through the end of

15   2008 and work activity for approximately three months in 2009 are inconsistent with her allegations

16   of complete disability beginning in September 2007.  Such activities may be valid reasons for

17   discounting subjective complaints of disabling pain and limitations.  *See generally Matney v.*

18   *Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992); *Fair*, 885 F.2d at, 602-606 ("credibility

19   determinations are the province of the ALJ").  Indeed, as the ALJ concludes, the record contains

20   "numerous inconsistencies between testimony and the evidence of record."  AR 16.  In sum, the

21   ALJ's credibility determination is supported by clear and convincing evidence in the record.

22       **E.  Remand for Additional Proceedings is Appropriate**

23       Given the court's conclusions about the ALJ's discrediting of Dr. Chang's opinion and reliance

24   on Dr. Bussey's and Dr. Newton's opinions, the court must decide whether to remand this case back

25   to the Social Security Administration for further proceedings or for the payment of benefits.

26       The Ninth Circuit has provided guidance on this question:

27       Remand for further administrative proceedings is appropriate if enhancement of the record
         would be useful.  *See Harman*, 211 F.3d at 1178.  Conversely, where the record has been
28       developed fully and further administrative proceedings would serve no useful purpose, the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   district court should remand for an immediate award of benefits. *See Smolen v. Chater*, 80
2   F.3d 1273, 1292 (9th Cir. 1996); *Varney v. Secretary of Health and Human Services*, 859
    F.2d 1396, 1399 (9th Cir. 1988). More specifically, the district court should credit evidence
3   that was rejected during the administrative process and remand for an immediate award of
    benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence;
4   (2) there are no outstanding issues that must be resolved before a determination of disability
    can be made; and (3) it is clear from the record that the ALJ would be required to find the
5   claimant disabled were such evidence credited. *Harman*, 211 F.3d at 1178; *see also*
    *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002); *Smolen*, 80 F.3d at 1292.

6   Where the *Harman* test is met, we will not remand solely to allow the ALJ to make specific
    findings regarding excessive pain testimony. Rather, we take the relevant testimony to be
7   established as true and remand for an award of benefits. *Varney*, 859 F.2d at 1401; *see also*
    *Reddick v. Chater*, 157 F.3d 715, 728 (9th Cir. 1998) (quoting *Varney* ); *Lester*, 81 F.3d at
8   834 (same); *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989) (same); *but cf. Connett v.*
    *Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (holding that the court has flexibility in crediting
9   petitioner's testimony if substantial questions remain as to her credibility and other issues
    must be resolved before a determination of disability can be made).

10

11  *Benecke v. Barnhart*, 379 F.3d 587, 594-95 (9th Cir. 2004).

12      Here, there are outstanding issues that must be resolved before it is possible to determine

13  whether Melancon is disabled. Nor is it clear that the ALJ would be required to find Melancon

14  disabled were Dr. Chang's evidence credited. In addition, because the ALJ ended her analysis at

15  Step Four, she did not consider whether Melancon could perform alternate occupations. Thus, the

16  *Harman* test is not met here and the "crediting as true" doctrine does not apply. Accordingly, the

17  court remands for further administrative proceedings. On remand, the Commissioner shall either

18  credit Dr. Chang's opinion or provide reasons for disregarding it that are sufficient under the above

19  analysis and the applicable law.

20                                          **CONCLUSION**

21      The court **GRANTS IN PART** Melancon's motion for summary judgment, **GRANTS IN**

22  **PART** the Commissioner's cross-motion for summary judgment, and **REMANDS** this case to the

23  Social Security Administration for further proceedings.

24      This disposes of ECF Nos. 22, 23, and 24.

25  **IT IS SO ORDERED.**

26  Dated: March 23, 2013                    _____
                                             LAUREL BEELER
27                                           United States Magistrate Judge

28